**ANDREW WILSON, Plaintiff**

**v.**

**HESS OIL VIRGIN ISLANDS CORPORATION and HESS CORPORATION, Defendants**

Case No. SX-13-CV-480,
Consolidated Under: In re Asbestos, Catalyst And Silica Toxic Dust Litigation, Case No. SX-15-CV-096

Superior Court of the Virgin Islands

Division of St. Croix

August 23, 2017

J. RUSSELL B. PATE, ESQ., The Pate Law Firm, St. Thomas, USVI; KOREY

A. NELSON, ESQ., KATIE K. MCGUIRE, ESQ., ALAYNE K. GOBEILLE, ESQ.,[*] C. JACOB GOWER, ESQ.,[*] Burns Charest LLP, New Orleans, LA; WARREN T. BURNS, ESQ., DANIEL H. CHAREST, ESQ., Burns Charest LLP, Dallas, TX; STEPHEN MURRAY, SR., ESQ.,[*] STEPHEN MURRAY, JR., ESQ.,[*] DEVIN A. LOWELL, ESQ.,[*] Murray Law Firm, New Orleans, LA, *For Plaintiffs.*

CARL A. BECKSTEDT III, ESQ., Beckstedt & Associates, Christiansted, USVI, *For Hess Oil Virgin Islands Corporation and Hess Corporation, Defendants.*

MOLLOY, *Judge*

## MEMORANDUM OPINION

(August 23, 2017)

**BEFORE THE COURT** is a motion filed by Defendants Hess Oil Virgin Islands Corporation ("HOVIC") and Hess Corporation ("Hess") to compel Plaintiff Andrew Wilson to undergo a CT scan of his chest "to determine whether or not there is any objective evidence of lung disease." (Defs.' Mot. to Compel Chest CT Scan of Wilson 5, filed June 1, 2017 (hereinafter "Mot.").) Wilson opposes. For the reasons stated below, the Court will deny the motion to compel.

## I. BACKGROUND

Andrew Wilson alleges he was exposed to asbestos during the years he worked at the oil refinery on St. Croix in the U.S. Virgin Islands and has developed asbestosis. On December 19, 2013, Wilson filed a complaint, amended on February 25, 2015, against Hess and HOVIC for negligence, alleging premises liability and supply of a chattel known to be dangerous for its intended use. Hess and HOVIC appeared and answered the amended complaint. They deny liability.

Because Wilson was not the only person to sue Hess and HOVIC in the Superior Court of the Virgin Islands in recent years, his case and over a hundred other cases were grouped together under a master case for pre-trial purposes. *See generally In re Asbestos, Catalyst and Silica Toxic Dust Exposure Litigation*, 67 V.I. 544, 546-550 (Super. Ct. 2017) (providing additional background regarding the master case). Because the

---

[*] Admitted *pro hac vice.*

number of individual cases grouped under the same master case exceeds one hundred, and further because counsel could not agree on the most efficient way to proceed with discovery, the Court ordered the plaintiffs to provide their medical records or authorize the release of their medical records and further to submit to a medical examination by a physician or other medical professional chosen by Defendants. Once Defendants obtained this enhanced information about each plaintiff, each side had to select four cases that would continue with discovery on an expedited basis and serve as bellwethers for the larger group. Further, because eight cases only represents about 7% of the entire group, and because each side presumably picked cases that best helped them — the Court selected another four cases at random to ensure the bellwethers proceeding with expedited discovery fairly represented the entire group. The twelve cases are designated as Group A, with the other cases designated as Group B. Counsel selected Wilson for Group A.[1]

Wilson was diagnosed on April 4, 2014 with interstitial lung disease. He previously had a chest radiograph, more commonly known as an X-ray, taken on September 30, 2013 and again on July 12, 2014, both by Angelo K. Galiber, M.D. On February 21, 2017, the doctor Defendants selected to examine the Group A plaintiffs (hereinafter "Plaintiffs"), James D. Crapo, M.D., examined Wilson. Initially, Dr. Crapo had requested that Plaintiffs have a postanterior and lateral X-ray taken before he examined them and also a chest CT scan as well.[2] Plaintiffs did not object to the X-ray exam, but they did object to the CT scan. So, Defendants offered to compromise.

Defendants agreed to request a CT scan only for those plaintiffs for whom Dr. Crapo, and the doctor Plaintiffs had hired, Christopher John, M.D., agreed should have a CT scan. In other words, if both

---

[1] Counsel were directed to submit the list of eight cases jointly to ensure that the record did not reveal who chose which cases.

[2] A CT or computerized tomography chest scan "combines a series of X-ray images taken from different angles and uses computer processing to create cross-sectional images, or slices, of the bones, blood vessels and soft tissues inside the chest." (Crapo Decl. ¶ 4a, Ex. 8 to Mot.) A CT scan is also known as a CAT scan, meaning computer-assisted tomography scan. *See Ford v. United States*, 165 F. Supp. 3d 400, 406 n.8 (D. Md. 2016) ("A CAT scan, also called a CT scan, is a sophisticated x-ray examination that reconstructs images of a part of the body to be examined . . . and produces a series of images called axial images, or slices, which are examined by doctors to help diagnose a patient." (quotation marks omitted)).

Dr. John and Dr. Crapo agreed, then that Plaintiff would undergo the CT scan. "In the event, Dr. Crapo and Dr. John disagree . . . then the parties agree[d] that . . . Defendants shall be entitled to seek a [c]ourt order compelling the diagnostic test." (Letter from C. Beckstedt to K. Nelson, p. 2, Feb. 11, 2017, Ex. 5 to Mot.)

Defendants informed Plaintiffs on March 17, 2017 that Dr. Crapo believed Wilson should undergo a CT scan based on "Dr. Galiber's reading of a September 30, 2013 chest x-ray [which] indicates slight increase in interstitial markings while a reading of a subsequent July 12, 2014 chest x-ray indicates the lung fields are normal." (Letter from C. Beckstedt to K. Nelson, p. 1, Mar. 17, 2017, Ex. 6 to Mot.) In other words, and according to Defendants' counsel, Dr. Crapo requested that Wilson undergo a CT scan — not because he believed it necessary for diagnostic purposes — but because another doctor, Dr. Galiber, had read two X-rays of the same person and got conflicting results. Wilson's counsel informed Defendants' counsel on May 22, 2017 that Dr. John did not believe a CT scan was necessary based on "conflicting reports by a radiologist [who] is not a NIOSH Certified B-Reader." (Letter from K. Nelson to C. Beckstedt, May 22, 2017, Ex. 7 to Mot.)

On June 1, 2017, Defendants filed a motion to compel Wilson to undergo the CT scan. Wilson filed a response in opposition on June 30, 2017.[3] Defendants did not file a reply, which was due on or before July 28, 2017. Counsel argued the motion in court on August 14, 2017.

## II. DISCUSSION

In their motion, Defendants state that the "court . . . may order a party whose mental or physical condition . . . is in controversy to submit to a

---

[3] Section 3(b) of the Case Management Order issued in the master case extended the time to file responses to motions and replies to responses to twenty-eight days from the date the motion or the response was served and filed because the parties, per section 3(a), are under an obligation "to meet and confer before filing any motion, including dispositive motions and motions related to discovery, so that the issues are crystallized . . . and ancillary issues, which the parties might resolve by communicating, are reduced." (Case Mgmt. Order 4, entered Mar. 19, 2015, *In re Asbestos, Catalyst, & Silica Toxic Dust Exposure Litig.*, SX-15-CV-096.) "Master case filings . . . [are] deemed . . . docketed and filed in the individual cases to the extent the master case filing applies to an individual case." *Id.* at 1. *Wilson* is one of the cases being managed under the master case. The Case Management Order governs the individual cases as well as the master case. Thus, per section 3(b), Wilson's response was due June 29, 2017, not June 30, 2017.

physical or mental examination by a suitably licensed or certified examiner.' " (Mot. 6 (quoting V.I. R. CIV. P. 35(a)(1)).) "Dr. Crapo examined all but two of the bellwether Plaintiffs over the course of two days in February, 2017. Of all the patients examined, Dr. Crapo only requested a chest CT scan for Andrew Wilson." *Id.* at 3.

> A chest CT scan will ultimately provide an objective image that will give greater detail to the condition of Plaintiff Wilson's chest and lungs . . . . Perhaps the CT scan will confirm normal lungs, perhaps it will confirm interstitial markings. But, no one disagrees that it will provide a better, more accurate picture of the condition of Plaintiff Wilson's lungs and resolve any conflict in the chest radiographs. With this more accurate picture, the medical doctors will be able to properly determine Plaintiff Wilson's medical condition, and the experts will be able to obtain reliable objective information on which to determine that condition as opposed to speculation from less accurate, less detailed, less clear and, most importantly, conflicting image. Ultimately, having this objective test will greatly assist the jury in determining the Plaintiff's medical condition and whether or not he is ill.

*Id.* at 8. Defendants claim that "Plaintiff's sole objection to the chest CT scan is that Plaintiff's expert, Dr. John, is not persuaded to agree to a chest CT scan because the radiologist who read the images, Angelo Galiber, M.D., is not a NIOSH certified B-Reader, like Dr. John." *Id.* at 7. But "[i]t 'is wholly inconsistent with the realities and complexities of modern medical practice,' " Defendants argue, "for a court to refuse to 'order examination by more than one doctor.' " *Id.* at 6 (quoting *Sloan v. Cost-U-Less*, 44 V.I. 79, 83 (Terr. Ct. 2001)). Moreover, " '[w]here specialists from various branches of medicine are required, there is nothing in Rule 35 to prevent the court from ordering examination by all of them.' " *Id.* (quoting *Sloan*, 44 V.I. at 83).

Wilson counters that Defendants asked him to undergo a CT scan only because of Dr. Galiber's conflicting readings. Dr. Galiber read the September 30, 2013 X-ray on April 28, 2014 "without the Plaintiff's permission" and "concluded that while there is some increase in interstitial markings consistent with slightly scattered fibrosis, there is no pleural disease evident." (Opp'n 2.) Two months later, Dr. Galiber read the July 13, 2014 X-ray and "concluded that the lung field were normal.

Based on these supposed conflicting x-rays, Defendants demand Mr. Wilson undergoes a CT scan." *Id.* Wilson objects.

He "already underwent a medical examination as contemplated by this Court's Case Management Order. And in connection with that medical exam, the Defendant[s] re-took a series of chest x-rays," he argues. *Id.* at 3. To now have to "undergo a CT scan equal to the radiation produced by hundreds of x-rays, that create no medical benefit for him, [and] actually increase[s] his risk of developing cancer," Wilson says no. *Id.* He further notes that "Rule 35 requires 'good cause' for each particular examination." *Id.* at 4. But Defendants have not shown good cause, he argues, because "a CT scan is not necessary to diagnose Mr. Wilson with occupational lung disease." *Id.* at 5. Furthermore, "Defendants have access to at least two sets of chest x-rays taken pursuant to the ILO standard."[4] *Id.*

The Superior Court of the Virgin Islands may "order a party whose . . . condition . . . is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner." V.I. R. Civ. P. 35(a)(1). This authority only took effect on March 31, 2017, when the Supreme Court of the Virgin Islands promulgated the Virgin Islands Rules of Civil Procedure. *See In re Adoption of the V.I. Rules of Civ. P.*, S. Ct. Prom. No. 2007-001, 2017 V.I. Supreme LEXIS 22 (V.I. Apr. 3, 2017). Virgin Islands courts have not had occasion to construe Rule 35 yet. The Reporter's Note states that the rule "continues the traditional requirement of an 'order' of the court authorizing the examination unless the parties enter an agreement on the topic." V.I. R. Civ. P. 35 (Rptr.'s Note). The notes of the reporter concerning the intent of rules are controlling absent

---

[4]    The National Institute for Occupational Safety and Health ("NIOSH"), a division of the Centers for Disease Control, developed the "B Reader" program for those physicians with a valid U.S. state medical license who demonstrate proficiency in the classification of chest radiographs for pneumoconiosis (such as asbestosis) using the International Labour Office ("ILO") Classification. Pursuant to this process, the B-Reader certification is a rigorous process and applicants must be recertified every four years. The ILO's protocol provides World-wide rules for systematically examining the x-ray in a step-by-step method and recording the abnormalities on a chest x-ray that can be attributable to the inhalation of dusts and fibers, such as asbestos. When interpreting x-rays, B-readers compare the x-rays to a standardized set of films developed by the ILO. Simply put, the NIOSH B-reader program is the World-wide industry standard for diagnosing occupational lung diseases like asbestosis according to a standardized process. (Opp'n 1-2 (footnotes omitted).)

precedent to the contrary. *Cf. Augustin v. Hess Oil V.I. Corp.*, 67 V.I. 488, 519 (Super. Ct. 2017); *see also Mills-Williams v. Mapp*, 67 V.I. 574, 585 (V.I. 2017) ("Reporter's Note eliminates any doubt.").

■ There is no precedent, whether binding or persuasive, regarding Rule 35. So, the Reporter's Note is instructive here. But the note does not explain what is meant by "traditional requirement." The practice in civil actions in the Superior Court, and previously the Territorial Court, was to apply the Federal Rules of Civil Procedure and the Local Rules of Civil Procedure as promulgated by the District Court of the Virgin Islands. *See generally Vanterpool v. Gov't of the V.I.*, 63 V.I. 563, 576-82 (V.I. 2015) (discussing history and background to this topic); *see also Mitchell v. Gen. Eng'g Corp.*, 67 V.I. 271, 283 (Super. Ct. 2017) ("At the time when Mitchell filed his second motion to amend, the Superior Court routinely applied the Local Rules of Civil Procedure promulgated by the District Court of the Virgin Islands through Superior Court Rule 7." (citing *Vanterpool*)). Prior to March 31, 2017, the Superior Court would have applied Federal Rule of Civil Procedure 35, not through Superior Court Rule 7, but through Superior Court Rule 39. *See* SUPER. CT. R. 39(a) ("Depositions and discovery shall be had in the Superior Court of the Virgin Islands, pursuant to the provisions of Rules 26 to 37, inclusive of the Federal Rules of Civil Procedure."), *repealed by In re Amend. to Rules Gov. the Super. Ct. of the V.I.*, ST-17-MC-019, 2017 V.I. LEXIS 60, at *1 (Super. Ct. Apr. 6, 2017), *as approved by* S. Ct. Prom No. 2017-006, 2017 V.I. Supreme LEXIS 23, at *1 (V.I. Apr. 7, 2017); *accord Sloan v. Cost-U-Less, Inc.*, 44 V.I. 79, 81 (Terr. Ct. 2001) ("Rule 35 of the Federal Rules of Civil Procedure, applicable to this Court pursuant to Rule 39 of the Rules of the Territorial Court."). However, in recent years, the Supreme Court of the Virgin Islands has instructed that courts applying Virgin Islands law must look to local law, including precedent and rules of procedure, first, before considering law from outside this jurisdiction. *See Vanterpool*, 63 V.I. at 576 ("Such uncritical application of the rules of another court to a proceeding in the Superior Court is wholly inconsistent with our admonition that 'the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and the Local Rules of the District Court should represent rules of last resort rather than first resort, and should be invoked only when a thorough review of applicable Virgin Islands statutes, Superior Court rules, and precedents from this Court reveals the absence of any other applicable procedure.'" (quoting

*Sweeney v. Ombres*, 60 V.I. 438, 442 (V.I. 2014) (per curiam)). The question here is whether *Sloan* is the "traditional requirement" contemplated by the Reporter's Note. *Sloan* is the only decision of a local court discussing when a court can order a party to submit to an examination. *But see also Bruce v. Bruce*, 17 V.I. 37, 40 (Terr. Ct. 1980) (citing 5 V.I.C. App'x I R. 35, 5 V.I.C. App'x IV R. 7, and *Schlagenhauf v. Holder*, 379 U.S. 104, 85 S. Ct. 234, 13 L. Ed. 2d 152 (1964), and concluding without discussion that "plaintiff clearly having put her mental and emotional condition in issue, the court believes defendant is entitled to such an examination.").[5]

█ As a decision of a trial court, *Sloan* is only persuasive on this Court. *See Der Weer v. Hess Oil V.I. Corp.*, 60 V.I 91, 101 (Super. Ct. 2014) ("[D]ecisions of trial level courts are not binding on any other court, including that same trial court." (citing *In re Q.G.*, 60 V.I. 654, 661 n.8 (V.I. 2014); *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 430 n.10, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996)). But *Sloan* might be more than just persuasive if the reference in the Reporter's Note to "tradition" means that the past practices of Virgin Islands courts were folded into the new rules to bring some stability to court procedure. *Cf. Lindell v. Kalugin*, 353 Ore. 338, 297 P.3d 1266, 1272 (2013) (*en banc*) ("Case law existing at the time of the adoption of the rule or its predecessor forms part of the context of the rule." (citations omitted)); *Vega v. Piedilato*, 154 N.J. 496, 713 A.2d 442, 454 (1998) (Handler, J., concurring) (" 'Courts have an obligation to harmonize their case law so as to bring about consistent common law development.' " (quoting parenthetically *Smith v. Bridgeport Futures Initiative*, No. 326697, 1996 Conn. Super. LEXIS 2158, at *6 (Super. Ct. Aug. 13, 1996) (other citation omitted)). Here, both sides cited Rule 35 of the new Virgin Islands Rules of Civil Procedure. But Defendants looked to *Sloan* for guidance. (*See* Mot. 6 ("This jurisdiction has held that a court may order an examination under FED. R. CIV. P. 35 even when the plaintiff has already had one examination." (citing *Sloan*, 44 V.I. at 81).) Wilson, however, looked to

---

[5] Until around 1994, the rules governing the District Court of the Virgin Islands, including the Appellate Division of the District Court, and the rules governing the Territorial Court of the Virgin Islands were printed as an appendix to title 5 of the Virgin Islands Code. The citation to Appendix I, Rule 35, was to Federal Rule of Civil Procedure 35, and the citation to Appendix IV, Rule 7, was to Territorial Court Rule 7.

federal authority. (*See, e.g.,* Opp'n 3 (citing *Stinchcomb v. United States,* 132 F.R.D. 29, 30 (E.D. Pa. 1990)); *id.* at 4 (citing *Schlagenhauf,* 379 U.S. at 118.)

Before the Legislature established a supreme court for the Virgin Islands, and certainly before the new rules were promulgated, Virgin Islands courts looked to what precedent was available and on point. With over ninety federal judicial district courts and thirteen federal circuit courts, the approach taken by federal courts around the country will always vary. *Cf. Gasperini,* 518 U.S. at 430 n.10 ("If there is a federal district court standard, it must come from the Court of Appeals, not from the over 40 district court judges in the Southern District of New York, each of whom sits alone and renders decisions not binding on the others."). Predictably, with so many sources to choose from, Virgin Islands courts varied in how they construed the same rules. Yet, neither the United States Court of Appeals for the Third Circuit, nor the Appellate Division of the District Court of the Virgin Islands — the *de facto* court of last resort and the interim appellate court, respectively, over the Territorial and Superior Courts before the Supreme Court was established — used their superintendent authority to guide the trial courts regarding what jurisdictions to look to when construing federal rules of procedure in the absence of binding precedent. *Sloan,* for example, did not explain why it looked to a decision of the United States District Court for the District of Maryland rather than a decision the District Court of the Virgin Islands had issued a few months earlier on the same topic. *See Nyfield v. V.I. Tel. Corp.,* Civ. No. 1999/202, 2001 U.S. Dist. LEXIS 5305 (D.V.I. Apr. 17, 2001), *overruled on other grounds by Theobles v. Indus. Maint. Corp. Co.,* 247 F.R.D. 483, 484 n. 1, 49 V.I. 537 (D.V.I. 2006). *Nyfield,* of course, was not binding on *Sloan. Sloan* may not have been aware of *Nyfield.* It was not reported.[6] But the more important point here is that for far too long, Virgin Islands courts have looked far and wide, relying on rules adopted by other courts and authorities issued by other jurisdictions to guide how we construe and apply our rules of procedure locally. *Cf. Antilles Sch., Inc. v. Lembach,* 64 V.I. 400, 418-19 (V.I. 2014) (" '[A]ny

---

[6] But see *Sloan,* 44 V.I. at 82, citing *Hirschheimer v. Assoc. Metals & Minerals Corp.,* 94-cv-6155, 1995 U.S. Dist. LEXIS 18378 (S.D.N.Y. Dec. 12, 1995), specifically using the Westlaw citation format, which presumably means the Territorial Court had access to Westlaw at that time.

authority the federal rules have over territorial courts is a function of territorial law,' not federal law." (quoting *In re Richards*, 213 F.3d 773, 787 n.4, 42 V.I. 469 (3d Cir. 2000))). Yet, even though the Virgin Islands has now begun to promulgate its own comprehensive set of rules of procedure, we could be right back where we started, searching high and low for relevant authority instead of looking first to our own precedents.

■ Although Virgin Islands Rule of Civil Procedure 35 is nearly "word-for-word identical" to Federal Rule of Civil Procedure 35,[7] neither the Supreme Court "nor the Superior Court is required to follow the United States Supreme Court's interpretation of the Federal Rules . . . as binding precedent, since the interpretation of Virgin Islands . . . rules remains a question of Virgin Islands law." *Id.* (citations omitted). Although the rules at issue in *Antilles School* were the Federal Rules of Evidence, which the Legislature of the Virgin Islands had adopted in 2010, the Supreme Court's holding certainly would carry forward to any new rules patterned after, or even borrowed from, the federal rules. Yet, notwithstanding Supreme Court precedent, Wilson returns to federal precedent construing Federal Rule of Civil Procedure 35 to support his position. This Court declines the invitation to take one step back after we just took two steps forward. Rather, the Court believes that the references in the Reporter's Notes to traditional requirements, practices, custom, and the like[8] should be read as embracing relevant decisions of Virgin Islands courts that addressed the same or similar practice or procedure. *Cf.* V.I. R. CIV. P. 1-3(a) ("When procedure is not prescribed by these Virgin Islands

---

[7] Subsection (a)(2)(C) of Virgin Islands Rule of Civil Procedure 35 is not found in Federal Rule of Civil Procedure 35.

[8] *See, e.g.*, V.I. R. CIV. P. 4 (Rptr.'s Note) ("Subpart (e) provides the *standard* means of serving an individual within the Virgin Islands. In addition to the *three traditional* means . . . the Rule now specifically recognizes that the court may — where the facts of a case demonstrate that these three methods are not workable — order another method." (emphasis added)); *id.* ("While the federal courts have reduced this period to 90 days, the provisions of Virgin Islands Rule of Civil Procedure 4(m) have kept this time period at 120 days, in keeping with traditional practice and in recognition of the burdens entailed in completion of service in the Islands."); V.I. R. CIV. P. 5 (Rptr.'s Note) ("Rule 5 continues the traditional requirement that . . . everything that is filed with the court must be served on every party."); V.I. R. CIV. P. 26 (Rptr.'s Note) ("Under Rule 26(b)(3) long-standing doctrines of trial preparation material protection, 'work product,' are continued, subject to the traditional doctrine that a showing of special need and an inability to obtain equivalent materials may overcome the protections of this doctrine."); V.I. R. CIV. P. 30 (Rptr.'s Note) ("Subpart (e) retains traditional practice for review and correction of the deposition transcript by the witness.").

Rules of Civil Procedure, precedent from the Supreme Court of the Virgin Islands, or the Virgin Islands Code, a judge may regulate practice in any manner consistent with the law of the Virgin Islands."); *In re Kelvin Manbodh Asbestos Litig. Series*, 47 V.I. 215, 227 (Super. Ct. 2005) ("[C]ourts have interpreted 'local laws' to include both legislation and common law precedent."); *see also* V.I. R. CIV. P. 11(b)(5) ("By presenting to the court a pleading, written motion, or other paper . . . an attorney . . . certifies that to the best of the person's knowledge . . . formed after an inquiry . . . that the applicable Virgin Islands law has been cited.").

■ It benefits no one, least of all the Judiciary, to discard years of precedent such as *Sloan*, which considered the same or similar rules as those we recently promulgated, and instead start from scratch and go searching high and low for what we already have. *Accord Joseph v. Guardian Ins. Co.*, 32 V.I. 49, 52 (Terr. Ct. 1995) ("The parties herein have needlessly confused the issue of this case with their citations of factually inconsistent federal law. The deposit at issue was made at the order of a Territorial Court judge in a Territorial Court case, pursuant to Federal Rule of Civil Procedure 62(d), a Territorial Court rule by adoption. Therefore, the law which should be looked to first is local law. Our case law is definitive on the purpose and nature of a supersedeas bond."). Where a new rule retains or incorporates a prior rule, whether a federal rule, a District Court local rule, or a Superior Court rule, and where local case law has addressed a prior rule, this Court believes — absent precedent to the contrary or a compelling reason to depart from such prior case law — that courts should look to this body of law first to harmonize our case law. Even though *Sloan* is not binding, the Court sees no reason to depart from it since *Sloan* discussed the standard for ordering a party to submit to a physical or mental examination.

The plaintiff in *Sloan* claimed that she "was shopping at a Cost-U-Less store located in St. Thomas, Virgin Islands, when she reached for a two-jar pack of mayonnaise, and was struck on her head when another two-jar pack fell from a higher shelf. . . . [S]he was rendered unconscious, and . . . injured her head and neck." 44 V.I. at 81. She sued Cost-U-Less and during discovery Cost-U-Less moved for an order to compel her to submit to three different examinations: one "by a team of psychological experts," *id.*, another "by an endocrinologist," *id.* at 82, and the third "by a vocational rehabilitationist." *Id.* at 83. Sloan opposed and moved for a

protective order. *See id.* at 80. The court granted the motion and ordered Sloan to submit to the three examinations, notwithstanding that she "already had one examination." *Id.* at 81.

■ *Sloan* concluded that, "[w]hen a plaintiff puts her emotional condition in issue, the defendant is entitled to a mental examination." 44 V.I. at 81 (citing *Bruce*, 17 V.I. 37). Courts also "may order an examination . . . even when . . . the plaintiff has already had one examination," but in that instance "a stronger showing of necessity may be required for repeat examinations." *Id.* (citations omitted). Further, "[b]ecause such an order may be made only on motion, it is incumbent upon the party seeking the order to provide necessary information to the court, i.e. the names of physicians and the type of examinations sought." *Id.* Some courts have "refused to order examination by more than one doctor." *Id.* at 83. But "such limitation is wholly inconsistent with the realities and complexities of modern medical practice. Where specialists from various branches of medicine are required, there is nothing in Rule 35 to prevent the court from ordering examination by all of them." *Id.* (quotation marks and citations omitted). Subjecting a party to an examination "by a 'team' of experts over a period of three days, or eighteen hours . . . [is] clearly unreasonable," however. *Id.* at 82 (footnote omitted). But "tests so common that they go hand in hand with the very notion of a medical examination" should be permitted *Id.* at 83 (citation omitted).

Wilson has put his physical condition in controversy in this case. He claims he was exposed to asbestos during the "approximately 40 years" that he "worked . . . inside the refinery." (Amend. Compl. ¶ 4.) He also claims he "was diagnosed . . . with [i]nterstitial [l]ung [d]isease" "on April 4, 2014." *Id.* ¶ 8. Clearly, Wilson could be ordered to submit himself for a physical examination. Wilson objects because he was already ordered to submit for an examination by Defendants. But as *Sloan* recognizes, "the realities and complexities of modern medical practice" may necessitate multiple examinations, 44 V.I. at 83 (quotation marks and citation omitted), especially when the condition, diagnosis, or disease may be complicated or uncommon. *Accord id.* at 82 n.1. Here, Wilson, himself, highlights the difficulties attendant to diagnosing pneumoconiosis, difficulties that necessitated the B reader program.

> In 1949, the International Labour Office (ILO) promulgated standards for systematically describing and recording radiographic appearances

of certain abnormalities caused by the inhalation of dusts. The principle intent of the standards was to achieve uniformity in assessing pneumoconiosis across readers. However, it was found that readers, despite employing the classification scheme, *still disagreed with each other and with themselves to an excessive degree.* As a consequence, NIOSH concluded that a proficiency program was needed to provide a pool of qualified readers. The NIOSH B Reader Program began in 1974, although it was not until 1978 that the B reader examination was given extensively.

CDC, NIOSH, *Chest Radiography: The NIOSH B Reader Program: Background,* available at https://www.cdc.gov/niosh/topics/chestradiography/breader.html (last visited August 10, 2017) (emphasis added) (citations omitted); *see also* Opp'n 1 n.1 (citing same). Accordingly, Wilson's concern over having to undergo multiple examinations to assess pneumoconiosis lacks merit.

Wilson next objects, claiming a CT scan "will provide no benefit" to him. (Opp'n 4 (bold font omitted).) "[A] CT scan is not necessary to diagnose" him "with occupational lung disease," he argues, and "Defendants [already] have access to at least two sets of chest x-rays taken pursuant to the ILO standard." *Id.* at 5. His expert concurs: "After reviewing the x-rays done of Mr. Wilson and the reasoning provided by the Defendants' doctor, I do not believe that a CT scan of Mr. Wilson would provide any diagnostic value." (John Decl. ¶ 8 (June 29, 2017), Ex. A to Opp'n.) Dr. John further remarks that "[u]sing a CT scan in the diagnosis of occupational lung disease would go against 50 years of accepted practice . . . and the methodology of the B reader process." *Id.* ¶ 8c. Yet, Dr. John did not dispute Dr. Crapo's representation that "Chest CT scan images provide *more detailed information* than do chest radiographs (i.e., x-rays)." (Crapo Affid. ¶ 4a (emphasis added).) Rather, Dr. John's concern is that NIOSH does not use CT scans in its B reader certification program. But it may one day soon.

A memorandum and order issued jointly by a United States district court judge and a United States bankruptcy court judge provides some background here.

Chest X-rays have been widely accepted as one of the most valuable tools in identifying asbestos-related conditions. The National Institute

for Occupational Safety and Health ("NIOSH") of the Centers for Disease Control and Prevention ("CDC") awards B-Reader approvals to physicians who meet a specified level of proficiency in classifying chest X-rays according to the ILO scale; these B-Readers must be re-certified at 4 year intervals. Chest roentgenograms are graded according to the number of abnormalities in a given area of the chest film. An 0 corresponds to no abnormalities, 1 to slight, 2 to moderate, and 3 to severe. Since this process is to some degree inherently subjective, readers give two classifications, the category that they think most likely and next most likely. The result is a 12 point scale, with results ranging from 0/0 (normal roentgenologic appearance) to 3/3 (severe abnormalities). These results are commonly called ILO readings or ILO X-ray readings. . . . Claimants today are diagnosed largely through plaintiff-lawyer arranged mass screening programs targeting possibly asbestos-exposed workers and attraction of potential claimants through the mass media. The programs rely almost solely on chest X-rays and pro-plaintiff readers to identify the injured. There is a significant amount of controversy both over the reliability of mass screening programs in particular and over the use and accuracy of X-rays in general in identifying asbestos-related diseases. A number of studies have shown that some plaintiffs' doctors consistently over-diagnose asbestos-related conditions. A 1990 study published in the Journal of Occupational Medicine found that only 16 of 439 claimants that filed lawsuits as a result of a 1986 mass screening of tire workers at their worksite demonstrated chest abnormalities consistent with asbestos exposure. . . . The process is intrinsically subjective at the margins. Probable over-diagnosis is related to a larger problem concerning the accuracy of X-rays in screening for asbestos-related injury. It is particularly difficult to diagnose the less severe manifestations of an asbestos-related injury on the basis of an X-ray alone. A medical surveillance program using spiral CT scanning technology has been proposed as one alternative to the current mass X-ray screening procedures. The specifics of such a program have not yet been completely detailed, including who would be responsible for running it, but the concept can be generally sketched. Spiral CT, or computed tomography, scanning involves a computerized assimilation of multiple X-ray images to create a two dimensional cross-sectional image. It can reveal abnormalities in lung tissue that would not be shown by a conventional

X-ray. Recent studies have suggested that a well designed program of spiral CT scanning for significantly asbestos-exposed workers could detect lung cancer early enough to possibly permit cure of a substantial percentage of the cases. Given the lack of current treatment options for mesothelioma and asbestosis, an earlier diagnosis, while allowing earlier compensation, might not make a greater number of cures of the most serious cases possible. There is substantial controversy surrounding the possibility of wide use of CT technology. There may be insufficient data to conclude that CT scanning provides a more accurate method of diagnosing asbestos-related conditions across the board. Substantial questions exist as to whether the use of CT scanning would be efficient and cost-effective. Further study on how best to structure a comprehensive CT screening program is necessary.

*In re Jt. E. & So. Dists. Asbestos Litig.*, 237 F. Supp. 2d 297, 308-10 (E.D.N.Y. 2002) (citations and paragraph breaks omitted). Further reports by NIOSH show that study in this area is underway:

Screening workers for pneumoconioses has employed chest x-rays acquired using film-based technology for more than 70 years. However, the use of film is rapidly being replaced by digital imaging. This alone demands that the use of digital chest images be researched and that reliable guidelines for their acquisition and use be developed. In addition, it may be that digital chest imaging has the potential for more accurate and reliable evaluation of the pneumoconioses and related diseases than previous technology. Towards these ends, NIOSH has embarked upon a program of research and evaluation of digital imaging methods, focused to date on chest x-rays, but not excluding other chest imaging modalities (e.g., computerized tomography).

CDC, NIOSH, *Chest Radiography: Digital Imaging Updates*, available at https://www.cdc.gov/niosh/topics/chestradiography/digital-imaging-upda tes.html (last visited August 10, 2017); *accord* Cecile Rose, M.D., M.P.H. & David Lynch, M.D., *The Role of CT Scanning in Pneumoconiosis Screening* 28, 29, The NIOSH B Reader Certification Program: Looking into the Future, DHHS (NIOSH) Publication No. 2009-140 ("For asbestos-related pleural disease, several papers have demonstrated that CT is more sensitive and more specific than chest radiograph. Extrapleural fat on the chest films leads to over-diagnosis of pleural disease (particularly on oblique radio-

538

graphs), while posterior plaques are not usually visible on chest radiograph. In patients with normal lung parenchyma by chest film, HRCT [or high-resolution computerized tomography] will show lung fibrosis in 13-54% of cases, depending on the population being screened. When the chest radiograph shows abnormal lung parenchyma, CT will confirm abnormality in 67-97% of cases." (endnote omitted)).

As Dr. Crapo explained in his affidavit:

> If the CT scan is negative, then it would assure Mr. Wilson and his doctors that he does not have significant lung disease. If the CT were positive for early interstitial fibrosis, then it would provide an important baseline to assess future changes or progression and it would help guide appropriate therapy for his symptom of shortness of breath (therapy which he is not now receiving).

(Crapo Affid. ¶ 4i.) Wilson's claim that a CT scan would not benefit him must be rejected. Cf. Jt. E. & So. Dists. Asbestos Litig., 237 F. Supp. 2d at 331-32 ("Screening designed to identify lung cancer and other asbestos-related malignancies earlier might prove beneficial. Yet, given the apparent lack of an effective treatment and cure for asbestosis and mesothelioma, earlier detection of these more serious diseases, while making it possible for individuals to receive compensation more promptly, may not have significant medical benefits." (citation omitted)).

Wilson's last two objections concern the risks associated with CT scans. "[A] single CT scan of the chest can subject a patient to the same effective radiation dose as anywhere from 100 to 750 chest x-rays," he claims. (Opp'n 6 (footnote omitted).) "One study of the estimated risks of radiation-related cancer among patients, aged 50-70, who received lung CT scans put the number of cancers at 230 out of 100,000 men screened." Id. (citing Martha S. Linet, M.D., M.P.H., et al., Cancer Risks Associated with External Radiation from Diagnostic Imaging Procedures 75, 81, CA: A Cancer Journal for Clinicians, vol. 62 (Mar./Apr. 2012)) (hereinafter "Cancer Risks").) "While this may not seem a great number," he says, "the risk here is certainly not as scientifically infinitesimal as Defendants argue." Id. He further argues that "[i]t is unclear whether or not an examination performed by a defendant's hired doctor creates a doctor-patient relationship under Virgin Islands law. A court in the Virgin Islands has never ruled on the issue." Id. at 6. Other jurisdictions

recognize that doctors hired by the Defendant have no doctor/patient relationship and have no duty to see that their evaluation takes into account the Plaintiff's health and wellbeing. So, any risk here created by subjecting Mr. Wilson to a CT scan is compounded by his potential lack of legal protections or recourse if he were to suffer any ill effect as a result of the scan.

*Id.* at 6-7. But Wilson "knows of no determination by Virgin Islands courts regarding the relationship between a plaintiff and a doctor hired by a defendant to perform an examination pursuant to Rule 35." *Id.* at 7. He worries that if he were injured — given increased cancer risks associated with CT scans — he might not have a recourse later.

There's good reason why courts afford litigants an opportunity to reply. A reply from Defendants to Wilson's response to their motion would have helped the Court here because Wilson raises valid concerns: the risk and the possible lack of recourse if that risk became a reality. Although the Court heard argument on this motion, the arguments of counsel cannot unravel this Gordian knot. But one thing is clear: Wilson's second argument concerning doctor-patient relationships and whether he would have a right to sue for malpractice the doctor Hess and HOVIC have retained if he were injured by the CT scan — this argument proceeds from a misunderstanding of how the common law develops. It too must be rejected.

█ It is not for this Court, in ruling on a motion for an order requiring a party to submit to an examination, to decide whether such examination could or should give rise to a doctor-patient relationship. Wilson's authority to the contrary, *Smith v. Welch,* 265 Kan. 868, 967 P.2d 727 (1998), actually makes this very point. *Smith* was a malpractice case that grew out of a car accident case. Welch was the doctor who had been retained in the car accident case to examine Smith. *See id.* at 729. Smith later sued Welch for assault, battery, and invasion of privacy, in addition to other claims, claiming Welch had sexually assaulted her during the examination. The legal question — "[w]as there a physician-patient relationship between Dr. Welch and Smith," *id.* at 736 — was not decided in the car accident case, but in the malpractice case. Similarly, whether to recognize a doctor-patient relationship between Wilson and Dr. Crapo (or whomever if the Court were to order Wilson to receive a CT scan) cannot be decided in this case. Dr. Crapo is not a party to this case and the

concerns and objection of non-parties are not relevant when ruling on a Rule 35 motion. *See Sloan*, 44 V.I. at 84.

■ But Wilson's concern about the potential risks associated with CT scans is relevant here. As he points out, "[a] [d]efendant cannot endanger or increase the risk of harm to a [p]laintiff in their medical testing. Courts recognize the need to balance the invasiveness or danger of any given requested procedure with its probative value." (Opp'n 5-6 (citing *Lefkowitz v. Nassau Cty. Med. Ctr.*, 94 A.D.2d 18, 462 N.Y.S.2d 903 (App. Div. 1983) (*per curiam*); *Il Grande v. DiBenedetto*, 366 N.J. Super. 597, 841 A.2d 974 (App. Div. 2004)).) That said, Wilson also did not move for a protective order. *Contra Sloan*, 44 V.I. at 80-81 (plaintiff moved for a procedure order in response to motion for an order compelling an examination which "permits the court to include appropriate protective measures when necessary." (citing FED. R. CIV. P. 26(c)). *Cf. Il Grande*, 841 A.2d at 977 ("Where a . . . medical examination involves an invasive procedure, we conclude that *if plaintiff moves for a protective order . . .* the burden of coming forward to establish the probative value of such procedure rests with defendant; plaintiff then must produce evidence that the proposed procedure presents a risk to plaintiff's health or is of such a nature that it will create substantial discomfort or distress; thereafter, the burden shifts back to defendant to establish the safety and reasonableness of the procedure. The judge must then engage in the weighing process that we have described, and if the judge concludes that the benefits outweigh the risks as we define them, the judge may issue an appropriate order having due regard for plaintiff's safety and comfort." (emphasis added)); *accord Lefkowitz*, 462 N.Y.S.2d at 905 ("Plaintiff *cross-moved* for a protective order, arguing that the test presents some danger to her health since the use of radiated material might cause a severe reaction, including a flare-up of her pelvic infection." (emphasis added)). Further, Wilson also did not himself submit an affidavit or other documentation to place on record the concerns his counsel attribute to him. Those concerns — fears and anxiety about the risks of CT scans — are factual, not legal, and cannot be raised by counsel in unsworn statements.[9] *Cf. Henry v.*

---

[9] While counsel did cite medical sources to support the concerns they raised about increased radiation exposure from CT scans, the timing could raise a question whether they are proceeding in good faith here. That is, if counsel really do object to CT scans because of the increased risk and the insignificant diagnostic value, then why did counsel "agree to . . . [the]

*Dennery*, 55 V.I. 986, 994 (V.I. 2011) (footnote and citations omitted); *see also* V.I. R. Civ. P. 26(c)(1) ("The court may, *for good cause*, issue an order to protect a party or a person." (emphasis added)); *accord Sloan*, 44 V.I. at 84 ("Plaintiff has *shown* good cause for restricting the examination time to 3 hours, including the administration of any tests." (emphasis added)).

Although Wilson did not move for a protective order, he has raised a legitimate concern. Considering that the focus of this litigation is exposure to harmful substances that may have caused Wilson (and the other plaintiffs) to develop cancer, the Court is not persuaded that more exposure to harmful substances is in order here. But most importantly, Defendants have not asked that Wilson be ordered to undergo a CT scan because Dr. Crapo discovered something abnormal on his X-rays. That is, the reason for requesting a CT scan is not medical but legal: getting a clearer picture of Wilson's lungs for discovery purposes because Dr. Galiber read two X-rays of the same man and reached contradictory conclusions for each. A CT scan is not the same as a deposition. That is, the request here is not to recall or reopen Wilson's deposition to clarify

---

Chest CT Scan proposal" Defendants' counsel "outlined" in their "February 17, 2017 letter." (Letter from K. Nelson to C. Beckstedt, Ex. 5 to Mot.) Plaintiffs' counsel knew that all Group A Plaintiffs might have to submit to a CT scan if both doctors agreed. Here, if Dr. Crapo and Dr. John had agreed that Wilson needed a CT scan, the issue would not be before the Court. Yet, now that the issue is before the Court, counsel for Wilson claims that a CT scan " 'would go against 50 years of accepted practice.' " (Opp'n 5 (quoting John Decl. ¶ 8c).) Either Plaintiffs' counsel genuinely agreed to all Plaintiffs (including Wilson) possibly having to submit to a CT scan — but why, if the procedure is so risky — or counsel only presented to agree, which means that counsel was either disingenuous with opposing counsel or with the Court. Or, perhaps counsel wised up between February 20, 2017, when they wrote to Defendants' counsel, and June 30, 2017, when they filed Wilson's opposition to Defendants' motion. This Court previously warned counsel against playing games during discovery (*See* Hr'g Tr. 17:4-7 (Mar. 29, 2017) ("Next time if it appears that there is some games being played, Hess or HOVIC will be responsible for paying the attorney's fees to litigate this particular issue.").) While the warning there was directed at Defendants, Plaintiffs too should have taken heed. No one is all knowing. If counsel determines, after research and review, that an earlier position was mistaken, counsel should disclose the change to the court to avoid appearing Janus-faced or disingenuous. Wilson's attorneys argued in court that the agreement with Defendants' counsel, to have Group A plaintiffs undergo a CT scan, presupposed that both doctors would have seen something suspicious on the X-rays to warrant a CT scan. Again, these representations are representations of fact — facts about what the parties agreed or understood their agreement to be — not arguments about what law governs. Facts are presented to courts through sworn testimony, not in unsworn statements of counsel. *Cf. Henry*, 55 V.I. at 994.

some confusion. Rather, Defendants want to subject Wilson to a CT scan to get a better look at his lungs. But again, the only reason for the request is not because there is something concerning on the two or three X-ray films all the doctors have read. Rather, the basis is conflicting readings by the same doctor. Such conflicts are for cross-examination.

## III. CONCLUSION

■ For the reasons stated above, the Court finds Defendants have not shown good cause for ordering Wilson to submit to a CT scan. Wilson did put his physical condition in controversy when he sued Hess and HOVIC for negligence and claimed they caused him to be exposed to asbestos. Wilson's concern that a CT scan would be his second examination in this litigation and that a CT scan would not benefit him are rejected as are his concerns over whether submitting to an exam requested by a doctor retained by opposing counsel could create a doctor-patient relationship. Even if it could, this case is not where that precedent can be established. But Wilson's concern about the risk from the increased amount of radiation in a CT scan is relevant. The reason why Defendants ask for a better look at Wilson's chest is not because of a spot or a mark on an X-ray that gives them pause. Rather, they want Wilson to undergo a chest CT scan to resolve contradictory X-ray readings given by the same doctor of the same individual. Cross-examination can resolve that issue.

An appropriate order follows.